```
                UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF WEST VIRGINIA
                        AT CHARLESTON
```

**UNITED STATES OF AMERICA**

v.                           CRIMINAL ACTION NO. 2:12-00215

**KEITH BRIAN CLARK**

<u>MEMORANDUM OPINION AND ORDER</u>

The defendant, Keith Brian Clark, is a 46-year old male who is charged with being a convicted felon in possession of a firearm. The indictment charges that the offense occurred on June 18, 2012, in Harts, a town located in Lincoln County, West Virginia. This matter is pending on the defendant's motion to determine the defendant's mental competency and whether he is able to understand the nature of the proceedings against him and assist his attorney in his defense.

Prior to the filing of the motion, the defendant's counsel arranged for the defendant to be examined by Fred J. Krieg, Ph.D., who has found the defendant not competent to stand trial. Thereupon the court appointed David A. Clayman, Ph.D., to

1

examine the defendant and evaluate him as to his competency. Dr. Clayman found the defendant to be competent to stand trial.

Dr. Krieg is a school psychologist and professor of psychology and school psychology at Marshall University Graduate College.  He is also engaged in providing consulting and psychological assessment and evaluation services.  Dr. Clayman is a psychologist and holds a clinical associate professorship with the West Virginia School of Medicine and has rendered evaluations in some 4,000 cases, of which three-fourths have been criminal cases.  The question of mental competency or criminal responsibility was involved in many of the criminal cases.

With the report of each of these examining professionals being made part of the record in the case, including the audio recording of the defendant's interview by Dr. Clayman[1], the court conducted an evidentiary hearing on June 20, 2013, at which each Dr. Krieg and Dr. Clayman testified, together with brief testimony from the defendant's sister-in-law, Linda Clark.

---

[1] The defendant requested, and the court consequently ordered, that a recording of Dr. Clayman's interview of the defendant be made.  An audio recording of Dr. Krieg's interview of the defendant, if one was made, has not been received.

2

I.

The circumstances giving rise to the events of June 18, 2012, have been related by the defendant as follows.  Early in the morning of that day, a girlfriend of the defendant, Arnicia Frye, drove him to Harts.  She dropped him off at a bridge and then drove across the bridge to wait for him while he went to a gas station where he intended to trade a gun for methamphetamine.  He had obtained the gun two weeks or so earlier.  Finding no one at the gas station and, needing to relieve himself, he dropped a bag containing the gun beside the bridge and went to a nearby bank to use the bathroom.  The time was about 8:00 a.m.  Finding the bank closed, he went down a hill and into the woods to relieve himself.  He returned to the bridge to pick up the bag and then commenced crossing the bridge to catch up with Arnicia and await the opening of the gas station.  At that point, he was arrested by West Virginia State Trooper Cummings.  The defendant, who had a prior felony conviction for second degree robbery, professes that he did not know it was unlawful for him to possess a firearm.

The state trooper who arrested the defendant at the bridge had received word that someone had attempted to enter the bank to rob it but, as reflected on a surveillance video, found the doors locked.  When the trooper approached the defendant, he was observed tossing a duffle bag over the side of the bridge.  The bag was retrieved and found to contain a 9mm handgun, a black face mask, two pairs of sunglasses and a pair of gloves.

As to the defendant's prior felony conviction for second degree robbery, he served five years in prison and was released in 2009.  He claims now that he merely went along for the ride with another person who committed the robbery of a pharmacy.  The pretrial services report in this case furnished to the court and counsel for the parties shows that the defendant, who was given a sentence of five to eighteen years, played an active role in the robbery.

II.

The defendant attended school until the tenth grade.  Beginning with the second grade, he was a special education student.  According to the Wide Range Achievement Test, he reads at a first grade level and performs math at a second grade

level.  His IQ is in the range of 57 to 61, placing him in the middle of the mildly mentally retarded range.  At age 16, while in the tenth grade, the defendant was struck by a vehicle and seriously injured, resulting in his hospitalization for two or three months.  He did not return to school.  At age 21 or 22, he sustained a serious head injury in a car wreck.  He suffers from mild depression.

  The defendant has never maintained employment at a regular or formal job.  He draws Social security payments under SSI and by virtue of his deceased father's black lung award.  His sister-in-law handles his money.  She says that if she sends him to the grocery store to buy an item, he may forget why he went there unless she provides a note for the grocer.  He lived with his mother until her death four years ago.  Her home is resided in by the defendant.  His oldest brother stays there with him for the most part.  He has never been married.  He has had about five girlfriends.  These include intimate relations with each Arnicia Frye and her mother who is near his age.  He says they and others have induced him to do things that got him in trouble.  He has one child, a son who is now 21 years of age, works as a coal miner, and is married, with a baby.

III.

In finding that the defendant is unable to understand the proceedings against him and assist his attorney in his defense, Dr. Krieg gives three fundamental reasons. First, he finds the defendant's IQ to be at a full scale level of 57 on the Wechsler Adult Intelligence Scale. Wechsler includes a Verbal Comprehension Index that Dr. Krieg believes to be the most important of the four indices scored and on which the defendant's percentile rank places him third from the bottom in a group of 1,000. Second, Dr. Krieg's understanding of the defendant's past persuades him that the defendant exercises very poor judgment and is easily led to say what he thinks others want to hear. Third, Dr. Krieg labels the defendant, who reads at a first grade level, as a functional illiterate.

Dr. Krieg administered two other principal tests. One is the Fitness Interview Test – Revised ("FIT-R"). As related by Dr. Krieg, that test asks the interviewee to state the events surrounding his arrest, identify courtroom participants, state how evidence is presented, and state the role of the jury. It also asks whether the interviewee understands cross-examination, pleadings and consequences of a guilty verdict. It is designed

to indicate how well one could assist his attorney in a courtroom with a defense strategy.  Dr. Krieg acknowledges that he does not know whether the FIT-R test is validated for a mentally impaired person.

The other major test performed is that of the MacArthur Competence Assessment Tool – Criminal Adjudication ("MacArthur").  As explained by Dr. Krieg, that test provides a story that involves an alleged criminal assault involving fictional characters and asks what one would do in response to charges arising from that conduct and why.  It includes a choice of either of two plea agreements, one favorable to the fictional defendant and the other obviously unfavorable.  Dr. Krieg does not elaborate on the particulars of the defendant's reaction or responses except to conclude that the defendant will be unable to perform the necessary reasoning in a way that would permit him to assist in his own defense.

While Dr. Krieg recognizes that the MacArthur test is not validated for the mentally impaired, he states that it is a means of measuring (1) understanding, which equals factual understanding of the proceedings, (2) reasoning, which equals the ability to assist counsel, and (3) appreciation, which

7

equals the rational understanding of the proceedings.  Dr. Krieg finds the defendant to be clinically, significantly impaired in all three areas.

According to Dr. Krieg, the defendant, in his interview with him was oriented as to time, place, person and circumstances, and his speech was relevant and coherent.  There was no evidence of disordered thinking, and no delusional system appeared to be present.  The defendant's stream of thought was spontaneous, coherent and relevant, although very limited.  In the performance of his testing, he was able to follow directions without difficulty, but occasionally asked for the instructions to be repeated.  Dr. Krieg's assessment of the defendant is that he understands the nature of the charges against him "to some extent" in that he knows it's about "owning the gun."  Dr. Krieg says the defendant does understand to some degree the possible consequences of the proceedings, but Dr. Krieg believes he does not appreciate the penalty.  The defendant, however, has stated that he thinks the penalty would be three to four years in prison, which is somewhat above a likely sentencing guideline range.  Dr. Krieg adds that the defendant does not understand key legal concepts and has little insight and no judgment.

8

Dr. Krieg finds that the defendant does not understand how the structure of evidence is presented or how examination and cross-examination works, nor does he understand who can call him to the witness stand and what would happen if he were a witness. Dr. Krieg believes that the defendant has very limited ability to communicate with his counsel and that he is extremely naïve and will do whatever his counsel tells him. While it is clear that the defendant does know right from wrong and knew that selling the gun for drugs was wrong, it is Dr. Krieg's belief that his thinking is extremely concrete and that he is unable to reason on his own behalf.

Dr. Krieg summarizes by stating that he

> used the MacArthur Competency Assessment Tool in an objective manner to lead to the fact that Mr. Clark cannot understand the scenarios as presented and could not defend himself in a court of law.

He then notes that he also

> administered the Fitness Interview Test – Revised, which confirmed the fact that Mr. Clark is not competent to stand trial.

9

Dr. Clayman substantially accepts Dr. Krieg's cognitive findings respecting the defendant, though he assesses the defendant's IQ slightly higher at 61.  As the audio recording of the interview of the defendant by Dr. Clayman discloses, the defendant was able to give a credible history of his family, which includes ten siblings, and an acceptable account of various notable instances in his life.

Dr. Clayman believes that the MacArthur test employed and relied upon by Dr. Krieg in measuring the defendant's ability to understand the proceedings against him and assist in his defense is of no use here in that the MacArthur test is designed for those with an IQ of 90 to 100 and cannot yield any meaningful conclusions as to this defendant.  Dr. Clayman instead used the test entitled Competency Assessment to Stand Trial for the Mentally Retarded ("CAST-MR").  That test is designed to be given to those more nearly approaching the limited intellectual capacity of the defendant.  With respect to the CAST-MR, the defendant obtained a score of 37 which, Dr. Clayman says, is the average score obtained by a cohort of 51 persons with mental retardation who were either found to be competent to stand trial or presumed competent to stand trial.

Dr. Krieg, while recognizing the merits of the CAST-MR for those in the lower IQ ranges, notes that he did not use that test because, as a written exam, one must be able to read at a fourth grade level.  Dr. Clayman explained that a written test is unnecessary and that the CAST-MR can be and was administered by him orally to the defendant.

According to Dr. Clayman, the defendant was very verbal during the interview and gave relatively cogent answers when asked open-ended questions.  There were times the defendant seemed to get confused but, when given a chance, or when questions were simplified, he provided understandable and consistent answers.  His speech was relevant and coherent, and there were no signs of psychosis.  In the course of testing he seemed to have some trouble understanding words and questions.  During the taped interview with Dr. Clayman, the defendant experienced difficulty in retaining the meaning of a word or term that had been explained to him.  While recognizing that patience will be required, Dr. Clayman believes that the defendant can understand the process if explained in a simplified way.

11

At the time of the defendant's interview with Dr. Clayman, he expressed the concern that the jury may not believe him. Inasmuch as the defendant has admitted that he was in possession of a firearm, his concern may seem curious, if not irrational. Yet, although it was not fully developed in the record, his concern may well have been that the jury would not believe him when he said that he did not know that his possession of a gun was unlawful. It should be made clear to the defendant that it does not matter, in the course of his being found guilty or not guilty, whether he knew possession of a firearm by him was unlawful.

Based on the totality of the information derived from the interview, the defendant's presentation and the testing administered, Dr. Clayman concludes that the defendant is able to understand the nature of the proceedings against him and to assist in the preparation of his defense.

12

IV.

The two experts in this case substantially agree on the Wechsler and Wide Range Achievement results.  As to the additional tests employed, the court gives greater credit to the testing performed at the instance of Dr. Clayman than that of Dr. Krieg.  The MacArther test used by Dr. Krieg is designed for individuals of near average intelligence and is well beyond the intellectual capacity of one such as the defendant.  It is so far beyond the defendant's capabilities that the result achieved was a predictable one.  Indeed, Dr. Krieg recognizes that the MacArthur test is not designed for mentally retarded individuals.  Dr. Krieg rationalizes its use on the premise that court proceedings cannot be "dumbed down" to a level that would permit the defendant to understand the proceedings and assist counsel in his defense.  Dr. Clayman believes the defendant can understand the process if explained in a simplified way.

The CAST-MR test is designed to fairly measure the mental grasp of one such as the defendant.  The test results, together with the totality of the information gathered in the course of interviewing the defendant, indicate to Dr. Clayman –

13

and to the court -- that the defendant does have the ability to participate in the adjudicative process if careful and simplified explanations of that which is occurring are provided him. As Dr. Clayman has found, with proper explanation, he should be able to understand the proceedings and assist his attorney in the presentation of his defense.

One further observation. The indictment in this case presents one of the simpler federal felony offenses. It is a status offense -- convicted felon in possession of a firearm. The essential elements consist of:

1. Knowing possession of a firearm;

2. By one who has a prior felony conviction;

3. Whose civil right to possess a firearm has not been restored; and

4. The firearm was in or affected interstate commerce.

The first two elements involve simple facts that seem to be understood and acknowledged by the defendant. The third element is readily researchable. The fourth can be reduced to the premise that a firearm manufactured in another state had to move across a state line in order to get here.

V.

While patience of the parties, counsel and the court will be requisite, the court finds by a preponderance of the evidence and concludes that the defendant is mentally competent to the extent that he is able to understand the nature and consequences of the proceedings against him and to assist properly in his defense.

The Clerk is directed to forward copies of this order to the defendant, all counsel of record, the United States Probation Department, and the United States Marshal.

DATED: October 10, 2013

John T. Copenhaver, Jr.
United States District Judge